DOUGLAS v. NEW YORK EL. R. CO. et al.

(Supreme Court, Appellate Division, First Department. December 8, 1899.)

1. INJURIES TO REAL PROPERTY—TITLE—EVIDENCE.
   In an action for damages to real property by an elevated railroad, defendants signed a stipulation that the property in question had been conveyed to plaintiff's father, and that plaintiff was his only heir; and it also appeared at the trial that plaintiff's father died, and that plaintiff had since inherited and held the property. *Held* sufficient to show title in plaintiff since his father's death.

2. ELEVATED RAILROADS—DAMAGE TO REAL PROPERTY—VALUE OF NEIGHBORING PROPERTY.
   In determining damages to real property by the operation of an elevated railroad in proximity thereto, testimony as to the general course of property values in the same neighborhood was competent, though there might have been causes operating on some portions of the property considered which would not operate on plaintiff's property.

3. SAME—CUSTOMARY USE OF PROPERTY.
   In determining the amount of damages to real property caused by the operation of an elevated railroad, it is proper to take into account the customary use to which property in the locality is put, and what effect the annoyance caused by the operation of the road would have on property so used.

4. SAME—MEASURE OF DAMAGES.
   The measure of damages to real property caused by the operation of an elevated railroad in close proximity thereto is the difference between the actual fee value of the property and what it would be worth if there were no elevated railway, and the amount of the decrease in rental value due to the operation of the road from six years next before bringing the action to the date of the decision.

   Van Brunt, P. J., and McLaughlin, J., dissenting.

Appeal from judgment on report of referee.

Action by William F. Douglas against the New York Elevated Railroad Company and the Manhattan Railway Company. From a judgment for plaintiff entered on a referee's report, defendants appeal. Modified.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

Edward C. James, for appellants.

Flamen B. Candler, for respondent.

INGRAHAM, J. The judgment in this action enjoins the defendants from the maintenance and operation of the elevated railroad structure in front of the plaintiff's premises, Nos. 125, 173, and 179 Pearl street, unless the defendants should pay the plaintiff the sum of $38,000; and further awards judgment for the damages for the past trespass upon the plaintiff's interests in Pearl street of $33,371. The appellants take the point on this appeal that the evidence shows that the plaintiff had no title to No. 179 Pearl street prior to the year 1895, and attention is called to certain quitclaim deeds dated in 1895, and also to a partition deed dated 16th January, 1834, as the only deeds or instruments offered in evidence relating to the title to No. 179 Pearl street. These deeds are not printed in full, the case merely containing a statement of the deeds, naming the

parties to them, and that they affect 179 Pearl street, with a statement that the exhibits are not printed, but may be produced and used by either party upon the argument to the same force and effect as if so printed. The appellants having stated that the effect of these deeds was to show that no title was vested in the plaintiff to this property prior to 1895, they sign a stipulation by which it appears that this deed of 1834 conveyed in fee simple to George Douglas, therein mentioned, the premises No. 179 Pearl street; that, in a record of partition suit introduced in evidence, it is alleged in the complaint, and the judgment found as a fact, that William P. Douglas is the only son and only heir at law of his father, George Douglas, deceased; and that William P. Douglas, the plaintiff, was entitled to the real estate of which George Douglas died seised. And there is further evidence that plaintiff's father died in 1863, leaving plaintiff his only heir at law, and that this property was in the possession of the plaintiff and his father for over 30 years prior to the trial of the action. It thus appeared in proof on the trial that plaintiff's father acquired the property in 1834, and that plaintiff inherited it on his father's death. The premises at 125 Pearl street face Hanover street. The elevated railroad structure in front of this station is 19 feet 8 inches in height from the street to the top of the ties, and the distance from the track walk on the side of the elevated structure to the building line is from 10 feet 10 inches to 14 feet 8 inches. There are two tracks in front of this property, the tracks being from 15 feet 7 inches to 19 feet from the building. Nos. 173 and 179 Pearl street are on the east side of Pearl street, between Cedar and Pine streets. The elevated structure in front of this property is about 25 feet from the surface of the street, and the distance from the house to the column in the street is 9 feet 4 inches, and the distance from the house to the rail is about 14 feet.

Before discussing the principal objections taken by the appellants upon the ground that the awards were excessive, we will consider the objections to testimony. The question was asked: "Taking the region bounded by Broadway, Cedar, and Pearl streets, down to Whitehall street; what has been the general course of values, in your opinion, rental and fee, in that district, in streets through which the elevated railroad does not run, since 1878?" This was objected to by the defendants on the ground that it "is too general and indefinite; that it includes a territory dissimilar, in the improvement of property, and in the use and occupation of property, from the street on which the plaintiff's property is located." After answering that question, the witness was further asked: "Now, take the region south of Cedar and Fletcher streets and east of Pearl street, between Pearl street and the river; what has been the course of values in that district, rental and fee, since 1878?"—to which the same objection was taken. While it may be said that some of the property within the boundaries mentioned is quite dissimilar from that of the plaintiff's property, still the section specified is bounded upon the street upon which the plaintiff's property abuts, and the question calls for the general course of values of that property on both sides of Pearl street, upon which the defendants' road is constructed.

The district to which the inquiry related is not remote from the plaintiff's property; and, while there are undoubtedly causes operating in favor of portions of this property which would not operate in favor of the plaintiff's property, it was competent to show the general course of values in this portion of the city. Property in the lower part of the city of New York, solely devoted to business purposes, would be subject to the general course of values; and, while particular blocks of property might be subject to greater fluctuation because of the local condition affecting a special locality either advantageously or disadvantageously, if a general course of value could be proved in that part of the city which includes the plaintiff's property it would be competent evidence to show the general course of values to which the plaintiff's property would under ordinary conditions be subjected. This case is entirely different from the Stuyvesant Case, 4 App. Div. 159, 38 N. Y. Supp. 595; for there the value of certain leaseholds upon Third avenue, at and below Twenty-First street, was compared with leaseholds on Fifth avenue between Forty-Seventh and Fifty-First streets,—property entirely dissimilar in character and use, not in any way contiguous to the property in question, and having no general relation to it. Here, as before stated, the locality is in the immediate neighborhood of the plaintiff's property. The two questions, taken together, inquire as to the general course of values of the portion of the city devoted to business purposes which adjoins the plaintiff's property, both on the east and the west; and it was quite material, it seems to me, for the plaintiff to establish that all of the property surrounding his upon both the east and the west had materially advanced in value since the construction of the elevated railroad. Under the Jamieson Case (N. Y. App.) 41 N. E. 693, all evidence of value of specified pieces of property must be excluded. It is only the general course of values of neighboring property that can be compared with the changes in the value of the property affected by the trespass; and in determining these questions the court must ascertain the facts, and compare the course of the value of the property in question with the general course of the value of other property in the same locality. There is nothing in the rule that restricts such an inquiry to immediate adjoining streets. A general view of the property used for similar purposes in a general locality would often be quite as useful in arriving at the correct result as to mention specific streets which would be more or less affected by local conditions. The ruling of the court that the defendants are bound by the principle established in the Jamieson Case is not an open question in this court.

We now come to the main question in the case, viz. the amount of the awards. As to No. 125 Pearl street, the evidence shows that the rent from 1873 to 1876 was $5,500; from 1876 to 1877, $5,950; and in 1878, $5,036. The year after the elevated road was built, in 1878, the rent decreased to $4,284 per year, and it is held at about that sum, the rent for 1895 being $4,050. These rentals include the whole building, which extends from Pearl to Beaver street, having a frontage upon both streets. As to the value of this property, we have the testimony of Martine, for the plaintiff, that

in 1873 it was worth $60,000, while Fish and Meyer, witnesses for the defendants, estimated it as then worth $65,000. In 1878 Meyer and Fish testified that the property was then worth $42,000 to $45,000; and Golding, a witness for the plaintiff, from $65,000 to $70,000. In 1897 Meyer values the property at $70,000, and Fish places upon it the same value. The two experts for the plaintiff valued the property in 1897,—Martine at $52,500, and Golding from $50,000 to $55,000. It was stated that the ratio of rent to the fee value in 1877 and 1878 was 10 per cent., while in 1897 it had been reduced to 8 per cent. or less. The rental of the property in 1877 and 1878 was $5,950, which would indicate a value much nearer to that placed upon it by the plaintiff's experts than that of the defendants. The rental value in 1896 to 1897, which is the last year we have of this property, is $4,100; and this would be about 8 per cent. on $50,000. There is some dispute as to the ratio between rents and fee value at the present time, but the witnesses for the defendants say that a net return of 4 per cent. from the property is considered fair; but to obtain a net rental of 4 per cent. would require a much larger gross rental. We have the undoubted fact that from 1878, although that was the depth of the panic, the actual rents received from this property have steadily decreased from $5,950 to $4,100. We have then the further testimony, which does not seem to be disputed, that other property in this locality has increased in value materially since the building of the elevated railroad, the amount of the increase being undoubtedly largely affected by local conditions; and certainly there has not been a street west of Pearl street, in this locality, which has not been very largely increased in both rental and fee values since the construction of this road. I think that the general effect of the testimony is that there has been also a substantial increase, although not as large, in the property east of Pearl street and south of Fulton street. I have read with care the testimony of the experts in this case, and, while I do not think that the reasons which they gave for their opinions as to the value of the property are entirely satisfactory, my general conclusion is that the values as estimated by the expert witnesses for the plaintiff are more satisfactory than those given by the expert witnesses for the defendants. In determining questions of this character, the court cannot shut its eyes to the effect of the operation of these railroads upon property devoted to business purposes,—especially for offices for lawyers, bankers, brokers, commission merchants, and kindred occupations; that the interference with light, and the pollution of the air by steam, gas, smoke, and cinders from these locomotives, coupled with the operation of the road, must have a serious effect upon the use to which property available for such purposes can be put. When the property is available for some other use, the influence of the operation of the road would not be so evident; but where the customary use to which property in the locality is put, and from which the greatest income could be obtained, is for office purposes, it is quite apparent that any use of a street which renders it impracticable to keep the windows open in summer without great discomfort,

which causes the light to be constantly interrupted, and causes the air to be so polluted that it is at times quite offensive, would seriously affect an office building, and must be detrimental. This plaintiff had a right to the use of this street free from any of these annoyances. The defendants, by their appropriation of the plaintiff's interest in the street, have imposed these annoyances upon the plaintiff's building; and certainly, in considering the reasonableness of an opinion of an expert as to the course of values, it seems to me that these facts must be taken into account.

Assuming this piece of property at present to be worth $60,000, it is quite apparent that it has only about held its own since 1878. I think it is quite clearly established that property off the line of this road—in fact, all property in the lower part of the city below Fulton street, except upon the line of the elevated railroad—has increased to a much greater extent than this Pearl street property since 1878. It is quite true, as claimed by the defendants and their witnesses, that this property has not been improved in such a way as to produce the greatest income; but all improvement of property in this immediate locality, from which the greatest income has been produced, has been in the erection of extensive office buildings. The very nature of the use of the street by the defendants, and the considerations as to its effect upon buildings rented for office purposes, render it at least doubtful whether such an improvement as has become advantageous in streets further west could be made upon these Pearl street properties. The evidence is that William street, the street on the west, has been largely improved by extensive office buildings; but no such office buildings have been erected on Pearl street, in the immediate locality of the elevated railroad, where the elevated railroad structure is as close to the property as it is in this case. Assuming that the property is now worth $60,000, the question which has to be determined is, what would it be worth now if there was no elevated railroad? It seems to be undisputed that the streets east of Pearl street, although further from Broadway and from the locality in which the great improvements in values have spread, are at least 25 to 30 per cent. higher than in 1878. This fact was testified to by the defendants' experts. This property produced in 1878 over $5,900. According to the ratio between rental and fee value, its value then would have been upwards of $59,000. Assuming that its normal state would have been 30 per cent., its value now would be in the neighborhood of $77,000; yet no one estimates it to be of that value, and, as before stated, I think the fair value for this property now does not exceed $60,000. Thus considering the ratio of increases of property on the east of Pearl street, and without considering the enormous increase in values in Broadway and adjacent property on the west, what is there to account for the fact that this property upon Pearl street has failed to correspondingly advance in value? We have evidence from the defendants' witnesses of the change in business conditions in this locality within the last 30 or 40 years, and that such changes have affected all of the downtown property, including Broadway, as well as Pearl street; and yet all of this property has increased in value. According to the testimony

of the defendants' witnesses, Broadway has trebled in value, Nassau street has more than doubled in value, and William street is worth double to-day what it was worth in 1878; and so in the cross streets. Between William and Broadway, and from Maiden Lane, going south, the property in these streets is worth more than double what it was worth in 1873, and in some cases it is worth three or four times as much as it was then. The presence of the defendants' structure is an established factor, and there is nothing else that would seem to cause a distinction between this and other property. The amount awarded as the fee value of the plaintiff's property in Pearl street, which has been appropriated by the defendants' road, was fixed by the referee at $18,000; and, while I hardly think the testimony would justify this amount, I think it fully justifies the sum of $15,000, to which the award for fee damage to this property should be reduced. The locality and use of the property Nos. 173 and 179 Pearl street are quite different from those of 125 Pearl street. These properties have never been used, and apparently are not available, for office purposes, to which the property No. 125 Pearl street has been put; and while the general considerations which we have adverted to, as to the course of values in property in this locality, apply, it is quite apparent that they have considerably less force as affecting property above Wall street than that below. The referee has allowed the sum of $10,000 as the fee value of the easements appropriated by the defendants for each separate piece of property. The testimony of Martine, one of the plaintiff's experts, is that the present value of these pieces of property is from $7,500 to $9,500 less than it was in 1873; the value being now about the same that it was in 1877, before the elevated road was built. Golding, the other expert for the plaintiff, testifies that in 1877, prior to the building of the road, these pieces of property were each worth from $25,000 to $27,500, and that to-day they are each worth $25,000, thus being considerably less in value than they were in 1873. The estimated present value of these pieces of property, as testified to by the defendants' experts, considering the rents produced and the general situation in that neighborhood, seems to me to be grossly excessive. Assuming that these pieces of property were each worth about $25,000 in 1877, and are worth about the same to-day, and that the increase in value but for the construction and maintenance of the elevated railroad would have been at least 25 per cent., that leaves the injury sustained by the plaintiff in consequence of the construction of the road the sum of $6,250 for each lot, which, I think, under the circumstances, is a reasonable conclusion from this evidence. I think, therefore, that the awards for fee damage should be reduced to $15,000 for 125 Pearl street, $6,250 for 173 Pearl street, and $6,250 for 179 Pearl street. The action was commenced July 10, 1886, and the plaintiff was entitled to recover past damages for the period commencing six years prior to the commencement of the action, viz. July 10, 1880. The decision was dated June 24, 1897, which was a period of nearly 18 years. The amount awarded by the referee for 125 Pearl street was $14,247, which is somewhat less than $800 a year. It appears that this property rented for $5,500 in 1873. In 1875 improvements

were made upon the property involving an expenditure of. about $8,000, when the rent increased to $5,950 a year. Immediately after the operation of the road it fell to $5,036 a year, and the year before the trial the total amount realized was $4,100, making a decrease of $1,850 per year in rents produced. It would be, however, quite unfair to attribute all of this decline to the maintenance and operation of the railroad, as the property also fronts on Beaver street, and there must undoubtedly be something allowed for the change in the character of office buildings which has resulted from the erection of a more modern and improved building than that of the plaintiff. Considering all the testimony, I think that the sum of $600 per year should be allowed for this depreciation of the rental values. As to 173 Pearl street, the amount allowed for depreciation for past damages to the premises was $7,300. It appeared from the testimony that the gross rental of 173 Pearl street decreased from the year 1873, when it was $3,000, to $2,150 for the years 1896 and 1897, being a decrease of $850. In 1877, before the building of the road, the rent received was $2,250. I do not think that the evidence would justify a greater allowance for loss of rental values by these properties in consequence of the elevated railroad than $250 per year, and the same may be said of 179 Pearl street.

My conclusion, therefore, is that the award for rental damages should be reduced to $600 per year for 125 Pearl street, and to $250 per year, each, for 173 and 179 Pearl street; that the judgment should be modified in accordance with the views herein expressed, and, as so modified, affirmed, without costs to either party upon this appeal. All concur, except VAN BRUNT, P. J., and McLAUGHLIN, J., who dissent.